**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Jun 16 2014, 9:15 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**MARK SMALL**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**RICHARD C. WEBSTER**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| BRENT R. GILBERT, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 28A04-1312-CR-613 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM GREENE SUPERIOR COURT
The Honorable Dena A. Martin, Judge
Cause No. 28D01-0908-FB-390

**June 16, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**KIRSCH, Judge**

Brent R. Gilbert appeals from the trial court's order revoking his placement in community corrections, contending that the trial court abused its discretion by committing him to the Department of Correction. Because Gilbert has failed to demonstrate an abuse of discretion, we must affirm the trial court's order.

**FACTS AND PROCEDURAL HISTORY**

On August 14, 2009, the State charged Gilbert in Greene County with one count of Class B felony dealing in a schedule II controlled substance, one count of Class C felony possession of methamphetamine with a firearm, one count of Class D felony possession of a chemical reagent or precursor with the intent to manufacture, one count of Class D felony maintaining a common nuisance, one count of Class A misdemeanor possession of anhydrous ammonia in an improper container, and one count of Class A misdemeanor possession of marijuana. The State later filed a request for an habitual offender sentence enhancement.

Gilbert and the State entered into a plea agreement, which was rejected by the trial court. On April 23, 2010, the State filed a petition to revoke Gilbert's surety bond, alleging that while released on bond, Gilbert had committed several felonies and a misdemeanor in Vigo County. At the conclusion of the bond revocation hearing held on May 3, 2010, the trial court revoked Gilbert's bond.

On October 8, 2010, Gilbert and the State entered into a negotiated plea agreement whereby Gilbert would plead guilty to one count of Class B felony dealing in methamphetamine and would be sentenced to sixteen years imprisonment at the Indiana Department of Correction with twelve years executed and four years suspended to

supervised probation. In exchange for Gilbert's plea, the State agreed to dismiss the remaining counts against Gilbert including the habitual substance offender request and the charges under a separate cause number in Greene County. On November 12, 2010, the trial court accepted the plea agreement and sentenced Gilbert to sixteen years imprisonment with four years suspended to supervised probation pursuant to the terms of the plea agreement.

On May 31, 2012, Gilbert filed a letter with the trial court alleging that he had cancer and requesting that the trial court hold a hearing. By an order entered on June 5, 2012, the trial court denied Gilbert's request, citing to the terms of the plea agreement, which did not contain a reservation of rights by which the trial court could modify Gilbert's negotiated sentence. On November 15, 2012, Gilbert filed a petition to modify his sentence and placement, again alleging that he had been diagnosed with stage 4 cancer while incarcerated. Gilbert requested a modification of his sentence to placement on home detention so that he could be close to his family and continue to receive necessary treatment. Gilbert also informed the trial court that the State had been consulted about Gilbert's requested and would leave the question of sentence modification to the trial court's discretion.

On January 7, 2013, the trial court issued its order granting Gilbert's petition to modify his sentence and placement, and ordering Gilbert to serve the remainder of his sentence on home detention. Gilbert was committed to the Greene County Community Corrections Home Detention program for the remainder of his sentence provided that Gilbert complied with the rules and regulations of that program. The order also specified

that if the Executive Director had an articulable suspicion that Gilbert was failing to comply with the rules and regulations of his placement, the Executive Director was authorized to transfer Gilbert to the Greene County Jail and file a written report to the trial court advising the trial court of the imprisonment. The Executive Director was also required to seek a modification of Gilbert's commitment to the Indiana Department of Correction in that event.

Gilbert began his home detention on May 2, 2013, and was advised of the rules and conditions of that placement by his case worker, Gregg Roudebush. Those terms and conditions included that Gilbert should violate no laws, should be of good character, and should comply with all conditions set forth in his order of probation. A standard condition of Gilbert's probation was the prohibition against using, possessing, or transporting any alcoholic beverage or using any controlled substance unless prescribed by a physician.

On October 3, 2013, at Roudebush's request, Community Corrections field officer Donald Fish conducted a home visit at Gilbert's residence to check on his well-being. Gilbert had contacted Roudebush to inform him that Gilbert's prescription medications had been stolen a few days earlier. When Fish arrived at Gilbert's home at 10:30 a.m., Fish could hear Gilbert in the back bedroom yelling and cussing. Fish continued to knock on the door. Gilbert answered the door yelling and cussing things like, "who the 'f' was there," and "what the 'f' was going on." *Tr.* at 14. Fish thought that this behavior was very unusual because Gilbert had not acted that way on prior visits. Gilbert, who was on the telephone, opened the door and allowed Fish to enter the house. Gilbert continued to curse and appeared to be irate. Gilbert lived with his parents, but neither of them were

4

present at that time. The house was a mess, which was the complete opposite of what Fish had observed on prior visits.

Fish sat and talked with Gilbert in an effort to calm him. During the course of their conversation Fish observed some of Gilbert's medications on the coffee table, but could not discern what the medications were. Fish spoke with Gilbert about his medication because of Gilbert's prior report to Roudebush about the theft of his medications. Gilbert told Fish that he had contacted the Sheriff's Department about the stolen medication and that he was in the process of getting some of them back. Gilbert began to calm down and Fish left, returning to Gilbert's house later in the day to check on him. Upon his return to the Community Corrections office, Fish reported to Roudebush about his observations at Gilbert's house including Gilbert's irrational behavior. After listening to Fish's report, Roudebush decided to call Gilbert into the office for a drug screen, but Gilbert could not secure transportation.

On the morning of October 31, 2013, Roudebush called to have Gilbert come in for a drug screen, but Gilbert again could not find transportation to the office. Roudebush then made the decision to conduct a home visit in order to accomplish the drug screen. Roudebush and Fish drove to Gilbert's residence and arrived at approximately 10:30 a.m. Two of Gilbert's friends were at the residence at that time, but remained in the back bedroom.

Fish and Roudebush observed bottles of pills on the coffee table and pills scattered on the coffee table and an end table. Roudebush asked to see Gilbert's medications. Gilbert did not seem to know where his medications were and wandered around the house in search

5

of them. Gilbert handed Roudebush a bottle of Lorazepam, a prescription that had been filled on October 29, 2013 for 60 pills. Roudebush counted the pills in the bottle and discovered that the bottle contained only 25 pills when, if taken as prescribed, there should have been at least 54 pills. Roudebush confronted Gilbert about the missing pills. Gilbert first explained that he did not like to take the pills because they were very strong, so he decided to flush the pills down the toilet. After further questioning, Gilbert admitted that he gave the missing pills to someone, but was "messed up," and did not remember to whom he gave the medication. *Id*. at 36.

Roudebush obtained a urine sample from Gilbert for the drug screen. The screen gave a positive result for Gilbert's prescription medications and also for the presence of methamphetamine. Fish was in the room when Roudebush confronted Gilbert about the positive results of the drug screen for the presence of methamphetamine. Initially, Gilbert denied ingesting methamphetamine, but eventually admitted that he "did a line" two days prior. *Id*. Gilbert told Roudebush that he had traded the Lorazepam pills to his brother in exchange for the methamphetamine. Gilbert then signed an admission that he did take the methamphetamine, which constituted a violation of the rules and regulations of the community corrections program. A laboratory analysis of Gilbert's urine sample confirmed the presence of methamphetamine.

While Roudebush had been counting Gilbert's medications and conducting the drug screen, Fish was looking around Gilbert's house. Fish went into the bedroom where Gilbert's friends had remained and observed on an end table a gallon jug of water, shredded cotton balls, and two small bottles of Coleman water purification tablets, all of which are

6

used to ingest illegal drugs. Fish asked Gilbert about the Coleman tablets. Although Gilbert responded that he used them when he went camping, both Fish and Roudebush knew that Gilbert was on home detention and had not been camping. Fish and Roudebush subsequently returned to the end table in the bedroom and discovered that the Coleman tablets had been moved, the shredded cotton balls were gone, and Gilbert's friends were no longer there.

The next day, Roudebush returned to Gilbert's residence to check on him and to conduct another pill count. The pill count was accurate. Roudebush again inquired about the Coleman tablets and told Gilbert that they were ineffective in masking methamphetamine for purposes of a drug screen. Gilbert replied that he was aware of that and changed his story about where he obtained the methamphetamine. Gilbert claimed that he did not get the methamphetamine from his brother, but had told Roudebush that story because he was angry with his brother. Gilbert changed his story to reflect that he had obtained the methamphetamine from the friends who were present at Gilbert's house when Roudebush and Fish were there the day before.

On November 26, 2013, Greene County Community Corrections officers filed a petition to modify Gilbert's placement alleging that on October 31, 2013, Gilbert was given a drug screen and had tested positive for the presence of methamphetamine. The petition also alleged that Gilbert had admitted to Roudebush and Fish that he had used methamphetamine and that he traded approximately thirty pills from his Lorazepam prescription for the methamphetamines. At the conclusion of the probation revocation hearing, the trial court found that Gilbert had failed to comply with the rules and regulations

7

of his placement. The trial court modified Gilbert's commitment and ordered him to serve the remainder of his twelve-year sentence in the Department of Correction. Gilbert now appeals.

## DISCUSSION AND DECISION

Gilbert appeals from the trial court's order revoking his probation, contending that the trial court abused its discretion by sentencing him to serve the remainder of his twelve-year sentence in the Department of Correction. We begin with the premise that "[p]robation is a matter of grace left to trial court discretion, not a right to which a criminal defendant is entitled." *Prewitt v. State*, 878 N.E.2d 184, 188 (Ind. 2007). "[C]ourts in probation revocation hearings may consider any relevant evidence bearing some substantial indicia of reliability." *Cox v. State*, 706 N.E.2d 547, 551 (Ind. 1999). It is within the discretion of the trial court to determine the conditions of a defendant's probation and to revoke probation if the conditions are violated. *Prewitt*, 878 N.E.2d at 188. In a sense, all probation requires "strict compliance" because probation is a matter of grace, and once the trial court extends this grace and sets its terms and conditions, the probationer is expected to comply with them strictly. *Woods v. State*, 892 N.E.2d 637, 641 (Ind. 2008). If the probationer fails to do so, then a violation has occurred. *Id.* But even in the face of a probation violation, the trial court may nonetheless exercise its discretion in deciding whether to revoke probation. *Id.* (citing *Clark Cnty. Council v. Donahue*, 873 N.E.2d 1038, 1039 (Ind. 2007) ("The probationary scheme is deliberately designed to give trial judges the flexibility to make quick, case-by-case determinations.")).

Violation determinations and sanctions are reviewed for abuse of discretion. *Id*. An abuse of discretion occurs where the decision is clearly against the logic and effect of the facts and circumstances, or when the trial court misinterprets the law. *Prewitt*, 878 N.E.2d at 188. We consider only the evidence most favorable to the judgment without reweighing that evidence or judging the credibility of the witnesses. *Woods*, 892 N.E.2d at 639 (citing *Braxton v. State*, 651 N.E.2d 268, 270 (Ind. 1995)). If there is substantial evidence of probative value to support the trial court's decision that a defendant has violated any terms of probation, the reviewing court will affirm its decision to revoke probation. *Id.* at 639-40.

Probation revocation is a two-step process. First, the trial court must make a factual determination that a violation of a condition of probation actually occurred. *Beeler v. State*, 959 N.E.2d 828, 829-30 (Ind. Ct. App. 2011). Second, if a violation is found, then the trial court must determine the appropriate sanction for the violation. *Id.* A probation revocation hearing is civil in nature, and the State's burden is to prove the alleged violations only by a preponderance of the evidence. *Figures v. State*, 920 N.E.2d 267, 272 (Ind. Ct. App. 2010). Violation of a single term or condition of probation is sufficient to revoke probation. *Washington v. State*, 758 N.E.2d 1014, 1017 (Ind. Ct. App. 2001). When reviewing an appeal from the revocation of probation, the reviewing court considers only the evidence most favorable to the judgment, and does so without reweighing the evidence or reassessing the credibility of the witnesses. *Piper v. State*, 770 N.E.2d 880, 882 (Ind. Ct. App. 2002).

9

Gilbert admitted to Roudebush that he violated the terms of his placement in community corrections by using and testing positive for methamphetamine. Thus, Gilbert is not challenging the sufficiency of the evidence supporting his probation revocation, but is challenging his placement in the Department of Correction.

Indiana Code section 35-38-2-3 provides leeway to the trial court in terms of its disposition upon the finding of a probation violation. Although Gilbert presents an argument akin to that made when sentences are reviewed under Indiana Appellate Rule 7(b), in the context of a trial court's sentencing decisions for probation violations, the standard of review is for an abuse of discretion. *Prewitt*, 878 N.E.2d at 188. "A trial court's action in a post-sentence probation violation proceeding is not a criminal sentence as contemplated by the rule. The review and revise remedy of App. R. 7(B) is not available." *Jones v. State*, 885 N.E.2d 1286, 1290 (Ind. 2008).

Community corrections programs consist of residential and work release, electronic monitoring, day treatment, or day reporting. Ind. Code § 35-38-2.6-2. "Alternative sentences such as probation and community corrections serve the humane purposes of avoiding incarceration and of permitting the offender to meet the offender's financial obligations." *Cox*, 706 N.E.2d at 550.

The trial court exercised its discretion by modifying Gilbert's sentence to allow for his placement in the community corrections program. Gilbert responded to this leniency by testing positive for methamphetamine in a drug screen, and the result was confirmed in a laboratory analysis. Gilbert admitted to Roudebush and Fish that he had used methamphetamine he obtained by trading approximately thirty pills of Lorazepam. Gilbert

signed a written admission that he had used methamphetamine and that to do so was a violation of the rules and regulations of the community corrections program.

The trial court did not abuse its discretion by returning Gilbert to his placement in the Department of Correction. Gilbert failed to follow the rules and it was within the trial court's discretion to order that Gilbert serve the remainder of his twelve-year sentence executed in the Department of Correction. *See Sanders v. State*, 825 N.E.2d 952, 957-58 (Ind. Ct. App. 2005) (trial court has discretion to order defendant to serve entire suspended sentence).

Affirmed.

MAY, J., and BAILEY, J., concur.